# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

MONTGOMERY KIDNEY
SPECIALISTS, LLP; CHARLES
THOMAS, M.D.; RAFAEL
LOPEZ, M.D.; and JOGY
VARGHESE, M.D.,

      Plaintiffs,

v.

PHYSICIANS CHOICE DIALYSIS
OF ALABAMA, LLC, a wholly-
owned subsidiary of DaVita, Inc.,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:17-cv-668-SRW

---

## DEFENDANT'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Physicians Choice Dialysis of Alabama, LLC, hereby gives notice of the removal of this civil action from the Circuit Court of Montgomery County, Alabama, to the United States District for the Middle District of Alabama, Northern Division. As grounds for removal, Defendant states as follows:

### INTRODUCTION

1.    This declaratory judgment action arises out of Plaintiffs' efforts to avoid contractual non-competition obligations. Plaintiffs, a nephrology practice that is an

Alabama citizen and three physicians who are Alabama citizens, are bound by multiple contracts with Defendant, a dialysis management center that is a citizen of Delaware and Colorado. The value to Plaintiffs of the object of their declaratory judgment action—i.e., removing the constraints of the non-competition obligations—is far in excess of $75,000.

2.     Accordingly, because of the diversity of the parties and the value of the object of the litigation, the Court has subject matter jurisdiction over this case pursuant to § 1332. Because the requirements of §§ 1441 & 1446 are satisfied, the case is properly removed.

## BACKGROUND

### I.     The Parties

3.     Plaintiffs are Montgomery Kidney Specialists, LLP ("Montgomery Kidney") and Charles Thomas, M.D., Rafael Lopez, M.D., and Jogy Varghese, M.D. ("Plaintiff Physicians"). Plaintiffs filed their Complaint for Declaratory Judgment ("Complaint") in the Circuit Court of Montgomery County, Alabama, Civil Action Number 03-CV-2017-901479.00, on September 19, 2017. The Complaint was served on September 22, 2017. According to the publicly available online docket, the return on service was executed on September 25, 2017. The Summons and the Complaint are attached hereto in one document as Exhibit A.

4.    Plaintiffs allege that "Montgomery Kidney is a nephrology practice that sees and treats patients in its offices, hospitals, and dialysis centers throughout the greater Montgomery area; and its physicians are members in good standing at numerous dialysis centers and hospitals at which their patients are admitted." Complaint, Ex. A, ¶ 10.   Montgomery Kidney is a "domestic limited liability partnership." *Id.* ¶ 1.

5.    The Plaintiff Physicians are nephrologists and are "each members in Montgomery Kidney." *Id.* ¶ 12. The Plaintiff Physicians are "citizen[s] residing in" Lee County, Alabama, and Montgomery County, Alabama. *Id.* ¶ 2–4.

6.    Nephrologists, according to the Complaint, "specialize in the treatment of patients suffering from kidney disorders, including those suffering from [end stage renal disease [("ESRD")]], who require renal replacement therapy such as hemodialysis, peritoneal dialysis, and renal transplantation." *Id.* ¶ 12. As Plaintiffs point out, nephrologists "provide inpatient (patients requiring hospitalization) and outpatient care to individuals with kidney disease. Often, after nephrologists follow and treat patients for years, the patients develop [ESRD] and begin dialysis treatment. The patients are then typically referred to an outpatient dialysis center, . . . where they are treated by nephrologists and other providers (e.g., nurses and patient care technicians)." *Id.* ¶ 11; *see also id.* ¶ 15 ("Dialysis centers are set up to administer dialysis treatments for patients suffering from ESRD.").

3

7.     Plaintiffs allege that Defendant, Physicians Choice Dialysis of Alabama, LLC ("PCDA"), is a "dialysis management company" that "owns and operates" an "outpatient dialysis cente[r]" in Montgomery, Alabama" ("East Montgomery Dialysis Center"). *Id.* ¶¶ 13–14.

8.     Plaintiffs further allege that "PCDA is a wholly-owned subsidiary of DaVita, Inc.," which is a "publicly traded corporation." *Id.* ¶ 13.

## II.     The Parties' Contractual Relationship

9.     Federal law requires that outpatient dialysis centers designate a "medical director" to oversee operations. Complaint, Ex. A, ¶ 15. Plaintiffs allege that medical directors "generally oversee procedures for quality control relating to the provision of dialysis treatment, and are not involved in the day-to-day management of dialysis centers." *Id.* ¶ 17.

10.    Plaintiffs allege that "Montgomery Kidney, through its physicians," serves as the medical director for the East Montgomery Dialysis Center. *Id.* ¶ 17. The relationship between Plaintiffs and PCDA is governed by the "Medical Director Agreement" ("East Montgomery MDA"). *Id.* ¶ 19. The East Montgomery MDA is attached hereto as Exhibit B.[1] The Plaintiff Physicians are parties to the East

---

[1] PCDA has redacted the dollar amounts representing the compensation payable to Montgomery Kidney under the MDA. *See* East Montgomery MDA, Ex. B, § 6. The redacted information is confidential information to PCDA and is revealed in the Declaration of Brandon King, for which Defendant is requesting leave of court to file under seal.

Montgomery MDA through the Joinder to Medical Director Agreement ("Joinder to East Montgomery MDA"), which is attached hereto as Exhibit C.

11.    Plaintiffs correctly point out that the East Montgomery MDA "contains a non-competition provision that runs for the term of the agreement plus two years after its expiration (the 'Non-Compete')." *Id.* ¶ 26; *see also* East Montgomery MDA, Ex. B, § 16. The Non-Compete provides that Montgomery Kidney and the Plaintiff Physicians agree that they will not, "directly or indirectly":

> (a) Take any action that results or may reasonably be expected to result in owning any interest in, leasing, operating, managing, extending credit to, or otherwise participating in (*e.g.*, as a medical director, contractor, consultant or employee), a Competitor in the Restricted Area; or

> (b) Own any interest in, lease, operate; manage, extend credit to, or otherwise participate in the business (including, without limitation, as a medical director, contractor, consultant or employee) of a Competitor in the Restricted Area.

*Id.* § 16.2(a) & (b). The Non-Compete further provides that

> Nothing in this Section 16 is intended to . . . Prevent [Montgomery Kidney or the Plaintiff Physicians] from engaging in the professional practice of nephrology or prevent [Montgomery Kidney or the Plaintiff Physicians] from exercising sound, professional medical judgment, while not limiting or unduly influencing a patient's right to choose where he or she desires to receive dialysis.

*Id.* § 16.4.2 (as amended by First Amendment to Medical Director Agreement).

12.    The purpose of the Non-Compete is not to prevent the Plaintiff Physicians from practicing medicine but instead to prevent the nephrologists from serving as

medical directors for, or owning an interest in, competing centers in and around Montgomery. Indeed, the Plaintiff Physicians regularly practice their profession at various hospitals and clinics in Montgomery, and the Non-Compete does not restrict those practices. *See id.*; *see also* Complaint, Ex. A, ¶ 10 ("Montgomery Kidney is a nephrology practice that sees and treats patients in its offices, hospitals, and dialysis centers throughout the greater Montgomery area; and its physicians are members in good standing at numerous dialysis centers and hospitals at which their patients are admitted.").

13.     Although not expressed in the Complaint itself, all Plaintiffs are bound by at least four additional medical director agreements that relate to other centers in the greater Montgomery area—the Elmore Dialysis Center, the Montgomery Dialysis Center, the Prattville Dialysis Center, and the Monarch Dialysis Center—and that contain the same non-competition language (including the same exemptions for the practice of nephrology). *See* Declaration of Brandon King, Ex. D, ¶ 16.[2]

14.     Montgomery Kidney Group, LLC, an entity of which Dr. Rafael Lopez, one of the Plaintiff Physicians, is a member, also owns the real property where the East Montgomery Dialysis Center is located. The lease agreement governing that

---

[2] The Declaration of Brandon King contains references to compensation for medical director services, joint venture shares, and profitability, all of which are confidential information to PCDA. Accordingly, in the accompanying Motion to Seal, PCDA seeks the Court's permission to file the Declaration of Brandon King under seal.

relationship, which is attached hereto as Exhibit E,[3] also contains a non-competition clause that obligates the landlord, Montgomery Kidney Group, LLC, not to "either directly or indirectly own, manage, operate, join, control or participate in the ownership, operation, management or control . . . of any business engaged in competitive services with [PCDA]'s affiliated dialysis business for the time period of three years and within a 75 mile radius of Montgomery, Alabama." East Montgomery Lease Agreement, Ex. E, § 14.b. Like the medical director agreements, the East Montgomery Lease Agreement contains an exemption for the practice of medicine: "This covenant shall not be construed to prevent Landlord from engaging in the practice of his/her profession within the prescribed area or elsewhere." *Id.*

## II.    Plaintiffs' Claim for Declaratory Relief

15.    Plaintiffs contend that the "Non-Compete is unenforceable under Alabama law for a host of reasons." Complaint, Ex. A, ¶ 35. Plaintiffs allege, *inter alia*, that "PCDA has no protectable business interest that warrants the enforcement of a non-competition agreement that is against public policy." *Id.*

16.    Thus, Plaintiffs allege, "[b]ecause the Non-Compete is unenforceable, Plaintiffs intend to explore their **options with respect to entering into a business**

---

[3]  PCDA has redacted the dollar amounts representing the lease payments payable to Montgomery Kidney Group, including the total dollar amounts and the dollar amounts per square foot. *See* East Montgomery Lease Agreement, Ex. E. The specific dollar amounts are confidential information to PCDA.

*relationship with other entities that provide dialysis services within the Non-Compete's restricted area.*" *Id.* ¶ 36 (emphasis added); *see also id.* ¶ 37 (describing "intent to explore other business opportunities with other dialysis management companies").

17.    Plaintiffs seek a "declaratory judgment finding and declaring that the Non-Compete is void and unenforceable" and "[s]uch other relief to which Plaintiffs may be entitled." *Id.* ¶ 40. Plaintiffs also "expressly stipulate that they do not seek, and will not accept, damages in excess of $74,000 exclusive of interest and costs." *Id.* ¶ 9.

## STATEMENT IN SUPPORT OF THE GROUNDS FOR REMOVAL

18.    Despite Plaintiffs' attempt to plead a barrier to federal jurisdiction in the form of an express stipulation regarding *damages*, the case is properly removable because federal law recognizes that the amount-in-controversy requirement in a case involving *declaratory* or *prospective* relief turns on the "value of the object of the litigation measured from the plaintiff's perspective." *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1268 (11th Cir. 2000). The value to Plaintiffs of breaking free from the Non-Compete is far greater than $75,000. The remaining elements of removability for a diversity jurisdiction case also are satisfied here. PCDA thus meets its burden to demonstrate the propriety of removal here. *See Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 913 (11th Cir. 2014).

8

19.   In the sections that follow, PCDA sets out the fundamental statutory provisions governing removal based on diversity jurisdiction before applying that law to this case.

## I.   Statutory Provisions

20.   The statutory grant of diversity jurisdiction is located in § 1332:

> (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>
> > (1) citizens of different States . . . .

21.   A defendant seeking to remove a case from state court to federal court also must satisfy the removal statutes. Section 1441 provides:

> (a) Generally—
>
> Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

Section 1446 provides:

> (b) Requirements; Generally—
>
> > (1) The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

. . . .

> (c) Requirements; Removal Based on Diversity of Citizenship—
>
> > . . .
>
> > (2) If removal of a civil action is sought on the basis of the jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy, except that—
> >
> > > (A) the notice of removal may assert the amount in controversy if the initial pleading seeks—
> > >
> > > > (i) nonmonetary relief . . .
> > >
> > > (B) removal of the action is proper on the basis of an amount in controversy asserted under subparagraph (A) if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the amount specified in section 1332(a).

## II.   Diversity of Citizenship

22.   "Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). This requirement is satisfied here, as all Plaintiffs are Alabama citizens, and PCDA is not.

23.   Montgomery Kidney is a citizen of Alabama. *See Jackson v. Ill. Cent. R.R. Co.*, No. 1:17-cv-424, 2017 U.S. Dist. LEXIS 153756, at *3 (S.D. Ala. Sept. 21, 2017) (explaining that removing defendant must "clearly allege [the plaintiff's] citizenship for purposes of § 1332(a)"). For diversity purposes, the citizenship of a limited liability partnership is the citizenship of its partners. *See Americold Realty*

*Trust v. ConAgra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016) ("For . . . unincorporated entities, we . . . have adhered to our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all its members. . . . Applying this principle with reference to specific States' laws, we have identified the members of a joint-stock company as its shareholders, the ***members of a partnership as its partners***, the members of a union as the workers affiliated with it, and so on." (emphasis added)); *see also Carden v. Arkoma Assocs.*, 494 U.S. 185, 187–88 (1990) (for diversity purposes, a limited partnership is a citizen of each state in which any of its partners, limited or general, are citizens).

24.    The Plaintiff Physicians themselves are partners in Montgomery Kidney, and, as detailed below in the immediately succeeding paragraph, they are citizens of and domiciled in Alabama. *See* Complaint, Ex. A,  ¶¶ 2–4, 12. The Plaintiff Physicians are the only partners in Montgomery Kidney. *See* Declaration of Brandon King, Ex. D, ¶ 11. Montgomery Kidney, therefore, is a citizen of Alabama. Stated differently, in a way that addresses the heart of the complete diversity inquiry, there are no partners of Montgomery Kidney that are citizens of the same states of which PCDA is a citizen.[4]

---

[4] Although the state of organization is not relevant to the citizenship inquiry with respect to an LLP, Plaintiffs allege that Montgomery Kidney is a "domestic limited liability partnership," Complaint, Ex. A, ¶ 1, shows that Montgomery Kidney is comprised of Alabamians. It is also

25.    The Plaintiff Physicians are citizens of Alabama. Plaintiffs allege in the Complaint that each of the Plaintiff Physicians is a "citizen residing in" Alabama. *Id.* ¶¶ 2–4. Although residence and citizenship are not synonymous for diversity purposes, the place of residence is prima facie proof of domicile and, therefore, citizenship. *See Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571 (5th Cir. 2011) ("Evidence of a person's place of residence . . . is prima facie proof of his domicile."). Thus, the Court may presume that the Plaintiff Physicians are domiciled in Alabama and that none of the Plaintiff Physicians is a citizen of the states of which PCDA is a citizen. *See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1342 (11th Cir. 2011) ("[W]e may presume that, until controverted by fact, he is domiciled at his current residence.").

26.    Defendant PCDA is a citizen of both Delaware and Pennsylvania. PCDA is a limited liability company. Similar to a limited liability partnership, the citizenship of a limited liability company is determined by reference to each of its members. *See Americold*, 136 S. Ct. at 1015; *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1221 (11th Cir. 2017) ("The citizenship of an LLC is the citizenship of each member.").

27.    The ownership chain of PCDA is as follows:

---

instructive that, given the obvious attempt in the Complaint to defeat diversity jurisdiction by "stipulat[ing] that they do not seek, and will not accept, damages in excess of $74,000," *id.* ¶ 9, Plaintiffs make no contention that any of the members of Montgomery Kidney shares a state of citizenship with PDCA.

12

- PCDA is wholly owned by:
- Physicians Choice Dialysis, LLC, which is wholly owned by:
- Physicians Management, LLC, which is wholly owned by:
- Physicians Dialysis Ventures, LLC, which is wholly owned by:
- Renal Treatment Centers, Inc., which is wholly owned by:
- DaVita, Inc.

Declaration of Brandon King, Ex. D, ¶ 7. Each of the LLCs in this chain of ownership has as its sole member the wholly owning entity. *Id.* The citizenship of Renal Treatment Centers, Inc., however, is determined pursuant to § 1332(c)(1), which provides that "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." § 1332(c)(1); *see also Onewest Bank, N.A. v. Melina*, 827 F.3d 214, 222 (2d Cir. 2016) (holding that "'a subsidiary corporation has its own principal place of business for purposes of diversity of citizenship jurisdiction'" (quoting Charles Alan Wright, *et al.*, 13F *Federal Practice and Procedure* § 3625 (3d ed.))). Thus, the citizenship of each LLC below Renal Treatment Centers, Inc., is that of Renal Treatment Centers, Inc. *See Stelly v. Baker Hughes Oilfield Operations, LLC*, 2017 U.S. Dist. LEXIS 156726, at *1 (W.D. La. Sept. 25, 2017) ("If the members are themselves partnerships, LLCs, corporations or other form of entity, their citizenship must be alleged in accordance with the rules applicable to that entity . . . ."). Renal Treatment Centers, Inc., is a Delaware corporation that maintains its principal place of business in

Colorado. *See* Declaration of Brandon King, Ex. D, ¶ 7. Accordingly, PCDA is a citizen of Delaware and Colorado.[5]

28.     Accordingly, all Plaintiffs are diverse from PCDA, and the complete diversity requirement of § 1332 is satisfied.

## III.     Amount in Controversy

29.     As the party invoking federal jurisdiction,   PCDA has the   burden to demonstrate the requisite amount in controversy. *See Dudley*, 778 F.3d at 913 ("[T]he removing party bears the burden of proof to establish by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional minimum."); *see also* § 1446(c)(2)(B) (stating that "removal of the action is proper on the basis of an amount in controversy asserted [by the removing defendant] if the district court finds, by a preponderance of the evidence, that the amount in controversy exceeds the amount specified in section 1332(a)"). A defendant must show either that it is "facially apparent from the pleading itself that the amount in controversy exceeds the jurisdictional minimum," or that there is "additional evidence demonstrating that removal is proper." *Roe v. Michelin North America, Inc.*, 613 F.3d 1058, 1061 (11th Cir. 2010). Despite Plaintiffs' attempt to prevent removal by "stipulat[ing] that they do not seek, and will not accept, damages in

---

[5] To the extent that the citizenship of DaVita, Inc., is relevant, it was incorporated in Delaware and maintains its principal place of business in Denver, Colorado. *See* Declaration of Brandon King, Ex. D, ¶ 7. DaVita, therefore, is a citizen of both Delaware and Colorado.

excess of $74,000," Complaint, Ex. A, ¶ 9, the Complaint and additional evidence demonstrate that more than $75,000 is in controversy here. *See Pretka v. Kolter City Plaza II*, Inc., 608 F.3d 744, 755 (11th Cir. 2010) (explaining that "defendants may submit a wide range of evidence in order to satisfy the jurisdictional requirements of removal" (citing with approval *Dep't of Recreation & Sports of Puerto Rico v. World Boxing Ass'n*, 942 F.2d 84, 88 (1st Cir. 1991) ("[T]he party seeking to invoke jurisdiction . . . may meet [its] burden by . . . submitting affidavits."))).

30.    While Plaintiffs have agreed to limit their *damages* claims to no more than $74,000, they also seek a *declaratory judgment*:

> Plaintiffs request that the Court enter and grant *declaratory relief in their favor as follows*:
>
> > a. A declaratory judgment finding and declaring that the Non-Compete is void and unenforceable; and
> >
> > b. Such other relief to which Plaintiffs may be entitled.

*Id.* ¶ 40. Plaintiffs' cursory boilerplate request for "[s]uch other relief" notwithstanding, Plaintiffs' stipulation regarding the amount of *damages* that they will seek is, therefore, no limitation on the total value of the relief sought in this action.

31.    The proper approach in cases involving declaratory or injunctive relief is to assess the value of the object of the litigation: "For amount in controversy

purposes, the value of injunctive or declaratory relief is the value of the object of the litigation measured from  the plaintiff's perspective." *Morrison*, 228 F.3d at 1268. "Stated another way, the value of declaratory relief is 'the monetary value of the benefit that would flow to the plaintiff if the [relief he is seeking] were granted." *S. Fla. Wellness, Inc. v. Allstate Ins. Co.*, 745 F.3d 1312, 1316 (11th Cir. 2014). The amount in controversy is "an estimate of the amount that will be ***put at issue in the course of the litigation***." *McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008) (emphasis added), *quoted in Pretka*, 608 F.3d at 751. Recognizing that complaints for declaratory and injunctive relief typically do not contain monetary figures, as noted above in Section I, the statute provides that "the notice of removal may assert the amount in controversy if the initial pleading seeks . . . nonmonetary relief." § 1446(c)(2)(A)(i). This case unmistakably fits within that paradigm.

32.     As Plaintiffs state unequivocally in the Complaint, the object of this litigation is a declaration that blesses Plaintiffs' ability "to ente[r] into a business relationship with other entities that provide dialysis services within the Non-Compete's restricted area." Complaint, Ex. A, ¶ 36; *see also id.* at 7 ("***Montgomery Kidney and the Plaintiff Physicians Intend to Explore their Options***"); *id.* ¶ 37 ("During this meeting, Plaintiffs explained why the Non-Compete is unenforceable and announced their intent to explore other business

16

opportunities with other dialysis management companies."). Plaintiffs therefore have placed hundreds of thousands—and perhaps millions—of dollars in controversy here.

33.    Given Plaintiffs' stipulation regarding damages, which announces an amount in controversy of $74,000, the amount placed in controversy by Plaintiffs' request for nonmonetary arguably need only exceed $1,000 in order to satisfy § 1332. *See Hardy v. Jim Walter Homes, Inc.*, No. 06-CV-0687, 2007 U.S. Dist. LEXIS 47758, 2007 WL 1889896, at *4 (S.D. Ala. June 28, 2007) ("[T]he value of the damages clai[m] must be aggregated with that of the declaratory judgment claim to determine the total amount in controversy for § 1332 purposes.").

### A.    Plaintiffs' Pursuit of Additional Medical Directorships Represents an Amount in Controversy of at Least $600,000

34.    Viewed in the context of the particular health care industry involved here, i.e., the provision of dialysis services, the stated intent of Plaintiffs is clear: Montgomery Kidney and the Physician Plaintiffs intend to establish new medical director agreements with competitors in efforts to generate additional revenue. The value of additional medical directorships, therefore, is central to the amount-in-controversy analysis.

35.    Remuneration for medical directorships in the industry is defined by a straightforward yet sophisticated formula designed to arrive at fair market value. Remuneration for medical directorships under DaVita modeling is a formula

designed to arrive at fair market value. The formula includes among many factors the experience level of the particular nephrologist, the size of the center involved, and the breadth of administrative, oversight, and management responsibilities that would be imposed upon the medical director in light of the size of the center and the number of patients serviced. *See* Declaration of Brandon King, Ex. D, ¶ 13. Based on that general formula, Plaintiffs receive hundreds of thousands of dollars in compensation for their medical director services at the dialysis centers. *Id.* ¶ 14. This is consistent with the fair market value of medical directorships in the Montgomery area. *See id.*; *see also* East Montgomery MDA, Ex. B, ¶ 6.4 ("The parties hereto agree that the compensation provided herein has been determined in arm's-length bargaining, and is consistent with fair market value in arm's-length transactions."). But Plaintiffs desire greater compensation for their medical director services, clearly indicating that Plaintiffs seek compensation that is above the range of compensation that PCDA pays. *See* Declaration of Brandon King, Ex. D, ¶¶ 17–18.

36.    In the nephrology industry generally, medical directorships ordinarily are memorialized in multi-year agreements. *See id.* ¶ 15; East Montgomery MDA, Ex. B, § 2.1 ("The Term of this Agreement . . . shall continue thereafter for a period of ten (10) years . . . ."). And medical directorships with PCDA's competitors likely would result in ***more than $60,000 per year*** for Montgomery Kidney. *See*

Declaration of Brandon King, Ex. D, ¶ 21.

37.    Accordingly, it is clear that Plaintiffs intend to seek medical directorships through multi-year agreements that would likely generate ***more than $600,000*** for ***each medical directorship obtained***. *See* Declaration of Brandon King, Ex. D, ¶ 20. Given Plaintiffs' stated intent to "explore their ***options*** with respect to entering into a business relationship with other ***entities***," Plaintiffs likely are pursuing a multiple of this dollar amount. This alone demonstrates that Plaintiffs have placed more than $75,000 in controversy.

38.    In fact, this intention appears to have manifested already, as one of Montgomery Kidney's employees, Dr. Harinaga Garapati, has agreed to serve on the governing body of a facility in Montgomery known as Montgomery Community Dialysis, which is currently seeking state approval to operate as a dialysis center in competition with PCDA. *See id.* ¶ 21. In the industry, service on a governing body is one of the medical director's roles. *See id.* Thus, the logical conclusion from the evidence relating to Montgomery Community Dialysis is that Dr. Garapati has agreed also to serve as medical director for that facility. The ability to enter into this agreement and others in the Montgomery area, notwithstanding their contractual obligations to PCDA, is the primary purpose of Plaintiffs' Complaint. These "reasonable deductions" and "reasonable inferences" from the evidence are sufficient to establish the satisfaction of the amount-in-

controversy requirement. *Pretka*, 608 F.3d at 754.

39.     Furthermore, the face of the Complaint reflects that Plaintiffs do not seek to
cancel the entire contract—they apparently wish to retain the medical directorships
they currently have with PCDA *in addition to* those that they intend to secure with
competitors. Thus, part and parcel of the object of Plaintiffs' Complaint is the
retention of the medical directorships with PCDA—a value of more than $400,000
per year to Plaintiffs. *See* Declaration of Brandon King, Ex. D, ¶ 14.

> **B.     Plaintiffs' Pursuit of Joint Venture Relationships and Additional
> Lease Agreements Represents an Amount in Controversy of More
> Than $600,000**

40.     The value to Plaintiffs from breaking the Non-Compete provisions is even
greater. The evidence also shows that, in addition to seeking medical directorships
at competitors, Plaintiffs seek to establish joint venture relationships with
competitors (a relationship that does not currently exist with PCDA) and landlord–
tenant relationships with competitors (a relationship that does currently exist with
PCDA). *See id.* ¶¶ 22, 30; *see also* East Montgomery Lease Agreement, Ex. I. The
lucrative nature of such relationships for Plaintiffs is a likely a significant factor in
Plaintiffs' decision to violate the East Montgomery MDA and the East
Montgomery Lease Agreement.

41.     As they expressed in the September 19, 2017, meeting that is referred to in
the Complaint, ¶ 37, Plaintiffs are frustrated with PCDA's unwillingness to allow

them to become joint owners or joint venture partners in the business of the dialysis center. *See* Declaration of Brandon King, Ex. D, ¶ 22. A joint venture interest in a dialysis center in the Montgomery area plausibly could result, for the benefit of Montgomery Kidney and the Plaintiff Physicians, in approximately *$500,000 per year*—an amount that would be multiplied over the course of several years. *See id.* ¶ 26. In conjunction with the evidence that Plaintiffs intend to seek joint venture partners in violation of the Non-Compete, this evidence further bolsters the conclusion that the amount in controversy is satisfied here.

42.    It is also evident that Plaintiffs intend to seek new landlord–tenant relationships through Montgomery Kidney Group, of which Plaintiff Physician Lopez is a member. *See id.* ¶ 30. During the preceding months, despite PCDA's attempts to negotiate extensions on the leases at the East Montgomery and Prattville dialysis centers, Montgomery Kidney Group has adamantly refused to so negotiate. *See id.* The only plausible explanation is that Montgomery Kidney Group intends to rent the property to a competitor of PCDA upon the expiration of the leases in 2018, which would be in violation of the Non-Compete.

43.    A lease of property for use as a dialysis center in the Montgomery market is determined by fair market value. Plaintiff Physician Lopez, however, has demanded lease agreements in excess of fair market value. *See* Declaration of Brandon King, Ex. D, ¶ 29. Based on the facts contained in the Declaration of

Brandon King, Ex. D, ¶¶ 27–30, this behavior leads to the conclusion that Plaintiff Physician Lopez and Montgomery Kidney Group intend to secure a lease agreement of ***more than $100,000 per year***, for multiple years, if they can escape their contractual non-competition obligations. *See id.* ¶ 30.

44.     The amount in controversy therefore is far in excess of $75,000.

### C.     Plaintiffs' Use of PCDA's Confidential Information Represents an Amount in Controversy of More Than $75,000

45.     Based on the foregoing evidence, a conservative calculation of the amount placed in controversy with respect to Plaintiffs' business relationships with PCDA's competitors includes at least $600,000 for medical director services; up to and perhaps more than $500,000 per year for joint venture interests for indefinite numbers of years; and more than $100,000 per year in lease payments for indefinite numbers of years. Over the multi-year lives of multiple agreements, Plaintiffs would generate hundreds of thousands—and perhaps millions—of dollars.

46.     In addition to these tangible numbers, other benefits will accrue to Plaintiffs and PCDA's competitors. For example, Plaintiffs' taking PCDA's valuable confidential information to competitors would result in a harm to PCDA and a benefit to PCDA's competitors of greater than $75,000. *See id.* ¶ 35. PCDA's goodwill also would be detrimentally impacted to the benefit of competitors. *Id.* As stated clearly in the MDA:

> [Montgomery Kidney and the Physician Plaintiffs] acknowledge and
> agree that they will be exposed to valuable confidential information of
> [PCDA] and will participate at [PCDA's] expense in building and
> maintaining its goodwill with patients, employees, vendors and others.
> [Montgomery Kidney and the Physician Plaintiffs] further
> acknowledge and agree that [PCDA] and Center would suffer serious,
> irreparable, competitive injury if [Montgomery Kidney and the
> Physician Plaintiffs] were to engage in any business or activities in
> competition with [PCDA] or Center.

MDA, Ex. B, § 16.2. DaVita's 2016 Form 10-K expands upon this common-sense

understanding of the business's financial health and potential competitive injury:

> ***Because of the ease of entry into the dialysis business and the ability
> of physicians to own dialysis centers and/or also be medical
> directors for their own centers***, competition for growth in existing
> and expanding markets is not limited to large competitors with
> substantial financial resources. Acquisitions, developing new
> outpatient dialysis centers, patient retention and physician
> relationships are a critical component of our growth strategy and our
> ***business could be adversely affected*** if we are not able to continue to
> make dialysis acquisitions on reasonable and acceptable terms,
> continue to develop new outpatient dialysis centers, ***maintain or
> establish new relationships with physicians*** or if we ***experience
> significant patient attrition to our competitors***.

DaVita, Inc., Form 10-K, Ex. I, at 28.

47.     The superior *quality* of the services and the facility—a by-product of the

confidential information and methodologies to which Plaintiffs have been privy, as

well as PCDA's investments in building up its goodwill—is central to PCDA's

profitability. *See id.* at 4 ("The [Centers for Medicare and Medicaid Services' Five-

Star Quality Rating] system provides patients reported information about any given

dialysis facility and identifies differences in quality between facilities so that

patients can make more informed decisions about where to receive treatment. For the third consecutive year, we are a leader in the industry under the CMS Five-Star Quality Rating system."). Plaintiffs' efforts to escape the obligations contained in the MDA and to enter into new business opportunities therefore could impinge on PCDA's relative advantage in Montgomery with respect to the quality of services. This is likely to result in a decrease in patients, which would cut severely into PCDA's revenue and, correspondingly, would benefit PCDA's competitors, including Plaintiffs if they achieve the declaratory relief they seek. *See* Declaration of Brandon King, Ex. D, ¶ 33.

48.     The value of PCDA's confidential information and methodologies and goodwill cannot be quantified with precision, but the value of those aspects of PCDA's operations at East Montgomery alone is estimated to be greater than $75,000. *See id.* ¶ 35. As noted in the foregoing paragraph, the harm to PCDA would be accompanied by a corresponding gain to PCDA's competitors of greater than $75,000. In light of the four additional centers at issue with respect to the parties' relationship, as well as the potential for Plaintiffs to enter into business agreements with multiple different competitors, the value of the confidential information and goodwill protected by the Non-Compete is a multiple of $75,000. *See id.*

49.     Because Plaintiffs have placed this amount in controversy, § 1332(a)'s threshold is satisfied for this additional reason.

## IV.     Remaining Requirements for Removability

50.     The foregoing averments demonstrate that this Court has original jurisdiction over this case and that PCDA is not a citizen of Alabama. *See* § 1441(a) & (b)(2). PCDA's removal to this Court, which is in the district and division embracing Montgomery County, is, therefore, statutorily authorized.

51.     Attached to this notice of removal are "all process, pleadings, and orders served upon" PCDA in this case. *See* § 1446(a). The Summons and the Complaint, which are attached as Exhibit A, are the only such documents that exist in this case.

52.     This notice of removal is filed within the 30-day limitation provided in § 1446(b)(1).

53.     A copy of this notice of removal will be provided to Plaintiffs, through their counsel of record, and to the Circuit Court of Montgomery County, Alabama. *See* § 1446(d).

## CONCLUSION

PCDA requests that the Court accept jurisdiction over this civil action and issue all necessary orders and process to remove this civil action from the Circuit

25

Court of Montgomery County, Alabama, to the United States District Court for the

Middle District of Alabama, Northern Division.

Respectfully submitted on October 3, 2018.

Larry B. Childs (ASB-9114-C58L)
Colin H. Luke (ASB-6723-L74C)
Charles H. Prueter (ASB-7968-B13A)
WALLER LANSDEN DORTCH & DAVIS, LLP
1901 Sixth Avenue North, Suite 1400
Birmingham, Alabama 35203
larry.childs@wallerlaw.com | 205.226.5701
colin.luke@wallerlaw.com | 205.226.5717
charles.prueter@wallerlaw.com | 205.226.5735

Robert D. Segall (ASB-7354-E68R)
Shannon L. Holliday (ASB-5440-Y77S)
Joel Caldwell (ASB-4625-Z36E)
COPELAND FRANCO
P.O. Box 347
Montgomery, Alabama 36101
segall@copelandfranco.com | 334.834.1180
holliday@copelandfranco.com | 334.420.2956
caldwell@copelandfranco.com | 334.420.2946

*Attorneys for Defendant Physicians Choice Dialysis of Alabama, LLC*

## CERTIFICATE OF SERVICE

I certify that, on October 3, 2018, I filed the foregoing document and exhibits in the Clerk's Office for the United States District Court for the Middle District of Alabama. I certify that I served, via email and U.S. Mail, copies of the foregoing document and exhibits on all counsel of record identified on the state court Complaint for Declaratory Judgment.

Joe Espy, III
J. Flynn Mozingo
MELTON, ESPY & WILLIAMS, PC
255 Dexter Avenue
Post Office Drawer 5130
Montgomery, Alabama 36103
jespy@mewlegal.com | 334.263.6621
fmozingo@mewlegal.com | 334.263.6621

Jeffrey C. Clark
Brett W. Barnett
McGUIRE WOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601
jclark@mcguirewoods.com | 312.849.8123
bbarnett@mcguirewoods.com | 312.849.8123

Of Counsel