IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MONTGOMERY KIDNEY | ) | |
| SPECIALISTS, LLP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Act. No.: 2:17-cv-668-ECM |
| | ) | (WO) |
| PHYSICIANS CHOICE DIALYSIS | ) | |
| OF ALABAMA, LLC, a wholly- | ) | |
| owned subsidiary of DaVita, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

## I.   INTRODUCTION

This case arises out of a complaint filed by Plaintiffs Montgomery Kidney

Specialists, LLP, Charles Thomas, M.D., Rafael Lopez, M.D., and Jogy Varghese, M.D.

seeking a declaratory judgment in the Montgomery County Circuit Court.  On October 3,

2017, Defendant Physicians Choice Dialysis of Alabama, LLC, a wholly-owned subsidiary

of DaVita, Inc., filed a notice of removal in this Court pursuant to 28 U.S.C. §§ 1332, 1441,

and 1446.  In response, the Plaintiffs filed a motion to remand the action to state court,

alleging that the amount-in-controversy requirement was not met.  Accordingly, the

magistrate judge granted the Defendant's motion for leave to conduct jurisdictional

discovery regarding the amount in controversy.  At the conclusion of jurisdictional

discovery, the parties submitted supplemental briefing on the amount in controversy.  On

November 13, 2018, after the Eleventh Circuit's decision in *Fastcase, Inc. v. Lawriter, LLC*, 907 F.3d 1335 (11th Cir. 2018), the parties again filed supplemental briefing.

Now pending before the Court are six motions: (1) the Defendant's motion to transfer venue (doc. 3); (2) the Plaintiffs' motion to remand (doc. 23); (3) a sealed motion (doc. 27); (4) Bio-Medical Applications of Alabama's motion to intervene (doc. 44); (5) Fresenius Vascular Care Montgomery, LLP d/b/a Capitol City Vascular Center's motion to intervene (doc. 46); and (6) the Defendant's motion to strike. (Doc. 52).

For the reasons that follow, the Plaintiffs' motion to remand (doc. 23) is due to be denied, the Defendant's motion to transfer venue (doc. 3) is due to be granted, the sealed motion (doc. 27) is due to be denied as moot, and the Defendant's motion to strike (doc. 52) is due to be denied as moot. Further, for the reasons discussed in Part III-D-*ii*, *infra*, the Court declines to rule on Bio-Medical Applications of Alabama's motion to intervene (doc. 44) and Fresenius Vascular Care Montgomery, LLLP d/b/a Capitol City Vascular Center's motion to intervene. (Doc. 46).

## II.    BACKGROUND

The Plaintiffs, a nephrology practice[1] and three physicians, contracted with the Defendant, a dialysis management company, to serve as medical directors for a dialysis clinic in Montgomery. (Doc. 2-1 at 9). The Plaintiffs brought a declaratory action in the Circuit Court of Montgomery County, seeking a ruling that the Plaintiffs are not bound by

---

[1] The Plaintiff nephrology practice is Montgomery Kidney Specialists, LLP. However, the Medical Director Agreement at issue was signed by a representative of Montgomery Kidney Specialists, LLC. *See* (Doc. 2-1 at 6); (Doc. 2-2 at 2, 49, 61); (Doc. 2-3 at 3, 5); *see also* discussion *infra* note 2. In its Answer to the Complaint, the Defendant "admits that the parties' relationship is governed by the Medical Director Agreement that was executed in 2013." (Doc. 4 at 4).

the contract's non-competition agreement ("NCA"). (Doc. 2-1 at 13).  As mentioned above, the Defendant removed the action to this Court. (Doc. 2 at 25–26).

The parties agree that complete diversity exists among them.  However, they dispute whether the value of the Plaintiffs' declaratory judgment claim satisfies the amount in controversy requirement. (Doc. 2 at 2); (Doc. 23).  Although the Plaintiffs seek a declaratory judgement that the NCA is invalid, the Plaintiffs stipulated that they do not seek and will not accept damages in excess of $74,000 exclusive of interest and costs. (Doc. 2-1 at 7). The Plaintiffs further stated: "[t]he value of the amount in controversy to Plaintiffs will not exceed $74,000 exclusive of interest and costs." (*Id.*).

### A.    *The Medical Director Agreement.*

Plaintiffs Charles Thomas, Rafael Lopez, and Jogy Varghese are "each members in Montgomery Kidney."[2] (Doc. 2-1 at 8).  In 2006, Montgomery Kidney Specialists, LLC, by and through its physicians, began serving as medical director for the East Montgomery Dialysis Center. (Doc. 2-1 at 9).  This dialysis center is owned and operated by Defendant Physician's Choice Dialysis of Alabama ("PCDA"). (*Id*. at 8–9).  The medical director relationship between Montgomery Kidney Specialists, LLC and Defendant PCDA is governed by the Medical Director Agreement ("MDA"). (*Id*. at 9) (Doc. 2-2).  The three Plaintiff physicians were joined to the MDA as representatives of Montgomery Kidney

---

[2] The use of the word "members" indicates that the Plaintiffs are referring to Montgomery Kidney Specialists, LLC, as opposed to Montgomery Kidney Specialists, LLP, which is one of the Plaintiffs in this case. *See* ALA. CODE §§ 10A-5A-1.08; 10A-8A-10.01. However, the Plaintiffs defined "Montgomery Kidney" as Montgomery Kidney Specialists, LLP. (Doc. 2-1 at 6). Because the parties do not dispute that their relationship is governed by the 2013 Medical Director Agreement, the Court will resolve the pending motions without untangling this issue.

Specialists, LLC. (Doc. 2-3 at 3). Additionally, Harinaga Garapati, M.D. was joined to the MDA as a representative of Montgomery Kidney Specialists, LLC. (Doc. 2-3 at 5). The MDA contains two provisions that are relevant to the Court's resolution of the pending motions. First, the MDA contains a forum-selection clause that serves as the basis for the Defendant's motion to transfer venue:

> Legal Action. Any and all actions at law or equity taken to enforce, interpret, or otherwise address the provisions of this Agreement shall be filed: if in state court, with the Circuit Court for the Tenth Judicial Circuit of Alabama (Jefferson County), Birmingham Division; and if in federal court, then in the Federal District Court of the Northern District of Alabama, Middle Division, sitting in the City of Birmingham, Jefferson County, Alabama.

(Doc. 2-2 at 22). As pointed out by the Defendant, the clause requires any legal action in federal court to be filed in the "Northern District of Alabama, Middle Division, sitting in the City of Birmingham, Jefferson County, Alabama[,]" but the City of Birmingham and Jefferson County are actually in the Southern Division of the Northern District of Alabama. (Doc. 22 at 18). Accordingly, the Defendant's motion to transfer seeks to transfer the case to the "Southern Division" (doc. 3 at 1), notwithstanding the forum-selection clause specifying the "Middle Division." (Doc. 2-2 at 22).

Second, the MDA contains the NCA that the Plaintiffs wish to have invalidated. (*Id.*). The NCA provides that Montgomery Kidney Specialists, LLC, for two years after the agreement is signed, will not directly or indirectly:

> (a) Take any action that results or may reasonably be expected to result in owning any interest in, leasing, operating, managing, extending credit to, or otherwise participating in the business (including, without limitation, as a medical director,

4

> contractor, consultant or employee) of a Competitor in the Restricted Area; or
>
> (b) Own any interest in, lease, operate, manage, extend credit to, or otherwise participate in the business (including, without limitation, as a medical director, contractor, consultant or employee) of a Competitor in the Restricted Area.

(Doc. 2-2 at 18). The "Restricted Area" is defined as:

> (a) for purposes of peritoneal dialysis of any type and the provision of home dialysis services and supplies anywhere within a thirty (30) mile radius and (b) for all other services anywhere within a ten (10) mile radius of Center's location as of the Commencement Date and its location at any time during the Period.

(*Id.* at 17).

The Plaintiffs seek to invalidate this NCA so that they may "explore other business opportunities with other dialysis management companies." (Doc. 2-1 at 12). The Plaintiff physicians and Thomas Karl, Chairman and CEO of Physicians Choice Management, LLC, have contemplated several new medical directorships, with associated ownership interests and long-term leases. (Doc. 56-2 at 11–12); (Doc. 56-10 at 2); (Doc. 56-25 at 2); (Doc. 56-27 at 2).

B.    *Harinaga Garapati.*

Harinaga Garapati is a "partner" in, or employee of, "Montgomery Kidney Specialists." (Doc. 56-2 at 16). Individually, Garapati wholly owns Dialysis Services of Montgomery, LLC. (Doc. 56-15 at 23) Garapati's wholly owned business entity entered into a medical directorship, an associated joint venture, and an associated lease agreement

for a new dialysis clinic within the area restricted by the NCA. (Doc. 56 at 10–11); (Doc. 56-12); (Doc. 56-13); (Doc. 56-14).

This medical directorship agreement promised Garapati $36,000 per year for a term of ten years. (Doc. 56-12 at 3, 5). The joint venture agreement promised Garapati 49% ownership of the dialysis clinic business and pro rata sharing of distributions. (Doc. 56-13 at 41). Further, the agreement called for an initial contribution between $1.4 million and $1.6 million. (*Id*. at 8). Under the lease agreement, the landlord of the clinic's premises is PCD Real Estate, LLC, of which Garapati owns 40% through Dialysis Services of Montgomery, LLC. (Doc. 56-14 at 3); (Doc. 56-17 at 5, 24). This lease agreement provided that the rent owed to the landlord would be $205,200 per year to be adjusted upward by "no less than three (3%) percent per annum" starting the third year of the lease, which had a term of fifteen years and an option to extend. (Doc. 56-14 at 3–4).

The Court is presented with two competing motions: a motion to remand for lack of subject matter jurisdiction (doc. 23) and a motion to transfer based on the forum-selection clause. (Doc. 3).

### III. ANALYSIS

#### A. *Priority of Motions.*

The Court is first tasked with determining whether it must rule on the motion to remand before ruling on the motion to transfer. Determinations of subject matter jurisdiction are preeminent. Thus, the general rule is that the Court must take up a motion to remand prior to a motion to transfer. *See Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[A] court should inquire into whether it has subject matter

jurisdiction at the earliest possible stage in the proceedings.); *see also* 15 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3843, n.2 (4th ed. 2018) ("When presented with competing motions to remand a case to state court and to transfer venue, a court will consider the remand motion first and then address transfer only if it denies the motion to remand."); *Callen v. Callen*, 827 F.Supp.2d 214, 215 (S.D. N.Y. 2011) ("When presented with competing motions to remand a case and to transfer venue, a court is to consider the remand motion first, and then address the motion to transfer venue only if it first denies the motion to remand.").

Deviations from this general rule are permitted in two different factual scenarios, neither of which are present here. The first scenario where a court would take up the motion to transfer prior to the motion to remand is where a defendant filed its notice of removal in the wrong court. *See Jordan v. E.M.S. Ventures, Inc.*, 2007 WL 9711483 (N.D. Ga. 2007) (granting a motion to transfer venue to the Southern District of Georgia prior to ruling on a pending motion to remand where the notice of removal was filed in the Northern District, but the state action was pending within the Southern District.); *see also* 28 U.S.C. § 1446 (a) (a defendant that seeks to remove an action to federal court must file their notice of removal "in the district court of the United States for the district and division within which such action is pending.").

The second factual scenario where a motion to transfer may be taken up first is where there is related litigation pending in the district where the motion to transfer seeks to transfer the case. *See Gould v. Nat'l Life Ins. Co.*, 990 F.Supp. 1354, 1358 (M.D. Ala. 1998) (granting a motion to transfer a case to the District of Vermont prior to ruling on a

pending motion to remand because the case was a nation-wide class action, three cases concerning the same facts were pending in the District of Vermont, and none of the pending motions would suffer prejudice from the transfer).

In the instant case, the state court action was pending in the Montgomery County Circuit Court. The Northern Division of the Middle District of Alabama encompasses the Montgomery County Circuit Court. Thus, the notice of removal was properly filed in the Northern Division of this District. Further, neither party has argued that there is related, pending litigation in the Northern District of Alabama such that the Court should rule on the motion to transfer prior to the motion to remand. Accordingly, the Court concludes that it must first decide the merits of the motion to remand.

### B. Motion to Remand.

As noted by the parties, "the burden of establishing removal jurisdiction rests with the defendant seeking removal." *Scrimone v. Carnival Corp.*, 720 F.3d 876, 882 (11th Cir. 2013). "Where . . . the plaintiff has not pled a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional requirement." *Williams v. Best Buy Co., Inc.*, 269 F.3d 1316, 1319 (11th Cir. 2001). Although the Plaintiffs pleaded that they would not accept "damages in excess of $74,000" and that the amount in controversy "will not exceed $74,000," the Plaintiffs exclusively seek declaratory relief. (Doc. 2-1 at 7, 13). Accordingly, the Plaintiffs' statements are afforded little, if any, weight in calculating the amount in controversy. *Compare Nationwide Prop. & Cas. Ins. Co. v. Dubose*, 180 F.Supp.3d 1068, 1071 (S.D. Ala. 2016) (District Court disregarded plaintiff's claim that

the amount in controversy exceeded $75,000 where the plaintiff sought only declaratory relief), *with Thomas v. Countrywide Home Loans*, 2012 WL 527482, at \*5–\*6 (M.D. Ala. 2012) (where plaintiff sought both damages and declaratory relief, the District Court accepted the plaintiff's cap on the amount in controversy and granted the plaintiff's motion to remand).

### i. The value of declaratory relief.

In determining whether the Defendant has proved the requisite amount in controversy by a preponderance of the evidence, this Court will follow the valuation procedure outlined by the Eleventh Circuit:

> [F]or amount in controversy purposes, the value of injunctive or declaratory relief is the value of the object of the litigation measured from the plaintiff's perspective. . . . Stated another way, the value of declaratory relief is the monetary value of the benefit that would flow to the plaintiff if the relief he is seeking were granted. . . . While absolute certainty is neither attainable, nor required, the value of declaratory or injunctive relief must be sufficiently measurable and certain to satisfy the amount-in-controversy requirement. . . . That requirement is not satisfied if the value of the equitable relief is too speculative and immeasurable. . . . It is a matter of degree.

*S. Fla. Wellness, Inc. v. Allstate Ins. Co.*, 745 F.3d 1312, 1315–16 (11th Cir. 2014) (internal quotations and citations omitted). In making this showing, a defendant is tasked with supporting its amount-in-controversy allegation "with evidence combined with reasonable deductions, reasonable inferences, or other reasonable extrapolations." *Pretka v. Kolter City Plaza II, Inc.,* 608 F.3d 744, 754 (11th Cir. 2010).

*ii.* *The value of the NCA.*

Where the object of the litigation is the plaintiffs' invalidation of a non-competition agreement, it follows that the value to the plaintiffs is the value of "conduct[ing] their business affairs free from the interference" of the agreement. *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1035 (5th Cir. 1980) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977)), *rev'd in part on other grounds*, 455 U.S. 283 (1982)[3]; *see also Weiner v. Tootsie Roll Indus., Inc.*, 412 Fed.Appx. 224, 227–28 (11th Cir. 2011) (in determining the value of a non-competition agreement, the court considered the value of the contract containing the non-competition agreement and the plaintiff's previous earnings to estimate the money the plaintiff would receive if his right to compete were restored).

Here, three physicians and their privately-held business seek to invalidate a non-competition agreement, so that they may, in their own words, "explore other business opportunities with other dialysis management companies." (Doc. 2-1 at 12). Thus, the issue before the Court is whether the evidence submitted by the Defendant, when combined with reasonable deductions, reasonable inferences, and reasonable extrapolations, establishes by a preponderance of the evidence that the invalidation of the NCA is worth more than $75,000 to the Plaintiffs. The Court finds that the Defendant has met its burden and established the requisite amount in controversy with sufficient certainty.

---

[3] The Eleventh Circuit adopted as binding all Fifth Circuit precedent prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Evidence presented by the Defendant establishes that Montgomery Kidney Specialists and its physicians seek to invalidate the NCA so that they may enter into several additional medical directorships, with associated ownership interests and long-term leases. (Doc. 56-2 at 11–12); (Doc. 56-10 at 2); (Doc. 56-25 at 2); (Doc. 56-27 at 2). The Court is satisfied that each of these potential agreements would be worth more than the requisite amount-in-controversy. In addition to the several contemplated agreements, one agreement nearly came to fruition, but fell through solely because the Defendant sought to enforce the NCA. This agreement alone was worth substantially more than the required amount in controversy.

To begin, Plaintiff Rafael Lopez testified that he, along with Plaintiffs Charles Thomas and Jogy Varghese, met with Thomas Karl, the Chairman and CEO of Physicians Choice Management, LLC, a competitor of Defendant PCDA. (Doc. 56 at 7–8). Lopez stated that the purpose of this meeting was to discuss opening new dialysis centers and that such arrangements usually involved entering into a joint venture partnership, a medical directorship, and a long-term lease. (*Id.*); (Doc. 56-3 at 15). The Plaintiffs and Mr. Karl agreed that no deal could proceed unless they "could get rid of that noncompete." (Doc. 56-3 at 16).

Similarly, Plaintiff Charles Thomas testified that he hoped he could escape the non-competition agreement so that the Plaintiffs could negotiate new arrangements that included ownership interests and lease payments on top of new medical directorships. (Doc. 56-4 at 14). Moreover, in an email exchange between Thomas Karl and Plaintiff Lopez, Karl assured Lopez that he knew an attorney who could invalidate the NCA, and in

11

the event that the NCA stood, the parties "will use Garapati if necessary to fill in the gaps."[4] (Doc. 56-10 at 2); (Doc. 56-2 at 14–15); (Doc. 56-18 at 2).

As discussed above, Harinaga Garapati is a "partner" in, or employee of, "Montgomery Kidney Specialists." (Doc. 56-2 at 16). Individually, Garapati wholly owns Dialysis Services of Montgomery, LLC. (Doc. 56-15). Garapati's wholly owned business entity entered into a medical directorship, an associated joint venture, and an associated lease agreement, all for a new dialysis clinic within the area restricted by the NCA at issue. (Doc. 56 at 10–11); (Doc. 56-12); (Doc. 56-13); (Doc. 56-14).

Importantly, Garapati entered into these agreements with the understanding that all benefits from the agreements "would go to Montgomery Kidney Specialists" and not to him personally. (Doc. 56-7 at 13). Additionally, Plaintiff Lopez's testimony affirms that any financial benefit to Garapati would be split among each of the partners of Montgomery Kidney Specialists. (Doc. 56-2 at 16). Further, prior to finalizing the agreements with Garapati, Karl sent copies of all the "closing documents" to Plaintiffs Lopez, Varghese, and Thomas for signature. (Doc. 56-11 at 2).

Garapati withdrew from these fully-consummated agreements only after the Defendant sent Garapati a Cease & Desist Letter (doc. 56-19), which challenged the agreements as a violation of the NCA. (Doc. 56 at 15 n.6); (Doc. 56-7 at 27–28, 31–32); (Doc. 56-20); (Doc. 56-21). At the time of his deposition, Garapati was still attempting to

---

[4] In a later email, Karl told Lopez: "I wish to make you at least two million on the next deal!" (Doc. 56-24 at 2).

withdraw from the real estate agreement that he signed as a part of this business transaction. (Doc. 56-7 at 32).

The medical directorship agreement promised Garapati $36,000 per year for a term of ten years, generating a cash flow of $360,000. (Doc. 56-12 at 3, 5). The associated joint venture agreement promised Garapati 49% ownership of the dialysis clinic business. (Doc. 56-13 at 41). This agreement provided for pro rata sharing of distributions and an initial contribution ranging between $1.4 million and $1.6 million, generating an initial ownership equity of $686,000 to $784,000 with the possibility of additional pro rata profit-sharing throughout the course of the business. *See* (Doc. 56-13 at 8, 10–11). Under the lease agreement, the landlord of the clinic's premises is PCD Real Estate, LLC, of which Garapati owns 40% through Dialysis Services of Montgomery, LLC. (Doc. 56-14 at 3); (Doc. 56-17 at 5, 24). This lease agreement provided that the rent owed to the landlord would be $205,200 per year to be adjusted upward by "no less than three (3%) percent per annum" starting the third year of the lease. (Doc. 56-14 at 4). The term of the lease is fifteen years with an option to extend, generating a minimum cashflow of $1,231,200 to Garapati. (*Id.* at 3–4)

These numbers are not speculative. They are readily observable in the agreements signed by Garapati—agreements that would benefit the Plaintiffs. The Court is persuaded that if the NCA is invalidated, the value to the Plaintiffs exceeds the jurisdictional amount. Specifically, the Defendant provided the Court with several examples of the Plaintiffs' communications with Karl that demonstrate a strong intent to enter into new dialysis clinic agreements. In fact, the Defendant provided evidence of the exchange of leasing,

13

ownership, and medical directorship contracts between Karl and the Plaintiff physicians. Finally, the project that the Plaintiffs tasked Garapati with carrying out fell through because the Defendant sought to enforce the NCA, which indicates that a similar agreement is likely to materialize if the NCA is invalidated. While the Defendant has not proven the future with certainty, the Court notes that "absolute certainty is neither attainable, nor required." *S. Fla. Wellness, Inc.*, 745 F.3d at 1316.

The Plaintiffs rely on *Ericsson GE Mobile Commc'ns, Inc. v. Motorola Commc'ns & Elec., Inc.*, 120 F.3d 216 (11th Cir. 1997) to support remand; however, this case is readily distinguishable from the instant case. In *Ericsson*, the plaintiff company, Ericsson, argued that the City of Birmingham improperly handled the competitive bidding process of a City contract, which resulted in Ericsson losing a $10 million contract to Motorola. 120 F.3d at 217–18.

In the early 1990s, the Mayor of Birmingham determined that the City needed a new public safety communication system. *Id.* at 217. Accordingly, the City issued a Request for Bids ("RFB") for two different communication technology systems: the APCO 16 and the APCO 25. *Id.* The RFB provided that vendors could submit bids for either or both systems. *Id.* Only Ericsson and Motorola submitted bids to the City: Ericsson bid on the APCO 16 for roughly $10 million and Motorola bid on the APCO 25 for just over $11 million. *Id.* After the bids were submitted, the Mayor concluded that the APCO 25 would better serve the City's needs, and the Mayor rejected both bids and negotiated an independent contract with Motorola. *Id.*

Ericsson argued that the City was biased in favor of Motorola and requested that the District Court enjoin the contract between the City and Motorola and have Ericsson declared the lowest responsible bidder. *Id.* at 217. The District Court adopted an advisory jury's verdict, which found that the City and Motorola violated the competitive bidding legal scheme, and the Court voided the contract. *Id.* at 217–18. However, the Court refused to declare Ericsson the lowest responsible bidder because Ericsson was ineligible for such relief. *Id.* at 221 n.16. The City and Motorola appealed. *Id.* at 218. The Eleventh Circuit, before taking on the merits of the appeal, considered whether the injunctive relief Ericsson sought satisfied the amount in controversy requirement. *Id.*

In measuring the amount in controversy, the Eleventh Circuit attempted to determine whether the voiding of the contract would be, from Ericsson's perspective, worth more than the amount-in-controversy requirement. *Id.* at 221. The Court held that the injunctive relief that Ericsson sought was "too speculative and immeasurable to satisfy the amount in controversy requirement." *Id.* at 221-22.

The court highlighted several reasons for its decision. First, the Court found that even if the contract were ultimately enjoined, the City would not be obligated to rebid the contract. *Id.* Additionally, the Court found that the City would be free to request a new bid proposal for APCO 25, a system for which Ericsson did not initially bid. *Id.* In other words, the court had no evidence that would allow it to reasonably conclude that Ericsson would acquire the City's new contract after the granting of an injunction.

Unlike *Ericsson*, the Defendant has presented ample evidence of the Plaintiffs' intended future business dealings, the Plaintiffs' nearly-consummated business deals, and

the high financial value of these transactions. Further, the record here contains substantial evidence of communication between the Plaintiffs and other dialysis management companies indicating an intent to enter into new contracts. Conversely, in *Ericsson*, there was no evidence of communication between Ericsson and the City of Birmingham that demonstrated an intent to accept Ericsson's potential future bid. *See id.* at 221-22. These important distinctions render the Plaintiff's reliance on *Ericsson* unavailing.

The Court concludes that the Defendant's evidence, combined with reasonable deductions, reasonable inferences, and reasonable extrapolations, establishes by a preponderance of the evidence that the invalidation of the NCA is worth over $75,000 to the Plaintiffs. Therefore, the motion to remand is due to be denied. Because the motion to remand is denied, the Court will take up the merits of the motion to transfer venue.

### C. Motion to Transfer.

The Defendant moves, pursuant to 28 U.S.C. § 1404(a), to transfer this case to the United States District Court for the Northern District of Alabama. (Doc. 3). Specifically, the Defendant contends that Plaintiffs "have failed to carry their burden to show that public interest factors overwhelmingly disfavor transfer." (Doc. 22 at 2). The Court agrees.

"Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of [28 U.S.C.] § 1406(a) or Rule 12(b)(3), the clause may be enforced through a motion to transfer under [28 U.S.C.] § 1404(a)." *Atl. Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 59 (2013). Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might

have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "[A] proper application of § 1404(a) requires that a forum-selection clause be 'given controlling weight in all but the most exceptional cases.'" *Atl. Marine*, 571 U.S. at 59–60 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)).

Ordinarily, upon receipt of a motion to transfer venue under § 1404(a), the Court would analyze a number of private and public interests to determine whether to transfer the case. *See Manuel v. Convergy's Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005) (setting out nine factors that a court must consider prior to transferring venue pursuant to § 1404(a)). However, "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." *Atl. Marine*, 571 U.S. at 63.

First, "the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.*

Second, when analyzing a defendant's § 1404(a) motion based on a forum-selection clause, a court disregards argument about the parties' private interests because "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. In other words, the private interest-interest factors "weigh entirely in favor of the preselected forum." *Id.*

With private-interest factors off the table, courts may only consider arguments about public-interest factors. *Id.* Such factors may include "'the administrative difficulties

17

flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Id*. at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).  Importantly, public-interest factors "will rarely defeat a transfer motion." *Id*. Thus, "the practical result is that forum-selection clauses should control except in unusual cases." *Id*. at 64.

Finally, where a valid forum-selection clause is present, "[the] § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules . . . ." *Id*. at 64 (citing *Piper Aircraft Co.*, 454 U.S. at 241 n.6).  This consideration does not impact the analysis in the instant case because the Defendant seeks to transfer the case to another federal court within the State of Alabama.  Thus, Alabama's choice-of-law rules will apply regardless of whether the case lands in the Middle District or Northern District of Alabama.

The Defendant asserts that the parties are bound by a valid forum-selection clause, and the Plaintiffs do not argue that the forum-selection clause is invalid.  The Plaintiffs argue that the Court should not transfer the case, notwithstanding the forum-selection clause, for three reasons: (1) the controversy is localized to the Montgomery area and should be decided here, (2) the burden on the citizens of the Northern District of Alabama of participating in jury duty is unfair, and (3) forcing the Plaintiff physicians to litigate in Birmingham is a public health risk because it would impact the physicians' patients in Montgomery.  The Court is unpersuaded by these arguments.

The Plaintiffs' arguments are founded on the faulty assumption that a United States District Court in Birmingham is too far removed from Montgomery to decide a dispute that

arose in Montgomery. To support their position, the Plaintiffs assert that "localized controversies [should be] decided at home." *Kolawole v. Sellers*, 863 F.3d 1361, 1372 (11th Cir. 2017). Without offering any legal authority on point, the Plaintiffs interpret the word "home" to mean the federal district embracing Montgomery, Alabama. The Court rejects such a narrow interpretation of the "local interest" factor.

Unlike *Kolawole*, 863 F.3d at 1372 (holding that the country of Nigeria, not the Southern District of Florida, possessed a "compelling" local interest in resolving the underlying mass tort controversy), the Middle District of Alabama possesses no greater local interest in resolving the Plaintiffs' declaratory judgment claim than the Northern District of Alabama. Local interests will be served regardless of whether this case is adjudicated in the Middle District or Northern District. In either scenario, a court in Alabama will apply Alabama law to the dispute, and, if necessary, a jury comprised of Alabama citizens will decide the outcome. Accordingly, transferring this case to the Northern District of Alabama does not deprive Alabama citizens of their interest in having localized controversies decided at home.

Further, the Plaintiffs assert, without authority or supporting facts, that the burden imposed on a potential jury in the Northern District of Alabama would be unfair. Again, this bare argument is unconvincing. In fact, the Court "does not see any potential unfairness in burdening the citizens of [Alabama] with jury duty; quite the contrary, [Alabama] citizens likely have a compelling interest in adjudicating activities that [affect physicians practicing] within the state's boarders." *Oribe Hair Care, LLC v. Canales*, 2017 WL 2059582, at *5 (S.D. Fla. 2017).

Regarding public health concerns, the Plaintiffs argue that litigating the case in the Northern District "poses a risk to [their patients'] health by unreasonably requiring the Physician Plaintiffs [sic] take unnecessary days away from their medical practice . . ., rather than *conveniently litigating* in the Middle District's Northern Division Courthouse . . .." (Doc. 21 at 9) (emphasis added). This argument fails for two reasons: first, the Plaintiffs do not provide any evidence indicating that the health of their patients would be adversely impacted if the case was transferred to the Northern District. Second, the convenience of litigating in the Middle District implicates the private interests of the Plaintiffs. *See Atlantic Marine*, 571 U.S. at 64 (stating "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation.").

To the extent that the public interest factors cited by the Plaintiffs cut in favor of transfer, the Court must balance them against the presence of a valid forum-selection clause. Eleventh Circuit precedent dictates that the existence of such a clause "is a *significant* factor that figures *centrally* in the district court's calculus" when evaluating a transfer pursuant to § 1404(a). *P & S Bus. Machs, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) (emphasis in original) (citations omitted). "[W]hile other factors might conceivably militate against a transfer . . . the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors." *Id.* (citations and quotations omitted). Thus, the Plaintiffs have the burden to convince the Court that this case is so "exceptional" or "unusual" that the forum-selection clause should not be controlling. *Atlantic Marine*, 571 U.S., at 59-60, 64. They have not done so.

Finally, the Plaintiffs argue in a footnote that the motion to transfer should be denied because the Defendant moves to transfer the case to the Southern Division of the Northern District of Alabama, yet the forum-selection clause specifies the Middle Division. The Court finds that reference to the wrong division in the Northern District is simply a "scrivener's error," which does not prevent the Court from enforcing an otherwise valid forum selection clause freely negotiated by the parties. Accordingly, the Defendant's motion to transfer this action to Northern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1404(a), is due to be granted.

### D. Remaining Motions & Costs.

#### i. Sealed motion.

The sealed motion (doc. 27) is due to be denied as moot. In any event, the Court did not rely on any of the disputed information in making its decision on the motion to remand. *See* discussion *supra* Part III-B-*ii*. The jurisdictional discovery obviated any need for the disputed information.

#### ii. Motions to intervene.

The motions to intervene (docs. 44 & 46) request that the Court permit outside parties to intervene for the limited purpose of modifying the Court's protective order (doc. 41), which limits the information sought in discovery. (Doc. 44 at 1); (Doc. 46 at 1). However, this protective order was not only applicable to the jurisdictional discovery period. Instead, it is binding for the entirety of the litigation, subject to changes made by further judicial order:

> This Protective Order governs the exchange of information in the course of jurisdictional discovery in this matter. Subject to the Court's approval and entry of any revisions requested by either Party to govern the exchange of information in the course of discovery on the merits in this matter, the obligations described in this Protective Order are to be in force for the duration of the litigation in the above-captioned matter and shall remain in effect subsequent to the termination of the above-captioned matter so as to protect the confidentiality of the information.

(Doc. 41 at 8). Because the effect of the protective order extends past jurisdictional discovery, the Court concludes that any matters relating to the modification of the protective order should be handled by the court that adjudicates the merits of the case or oversees further discovery. Therefore, the Court declines to rule on the motions to intervene. (Doc. 44 & 46).

### iii. Motion to strike.

The motion to strike (doc. 52) is due to be denied as moot. However, the Court, as demonstrated by the discussion in Part III-B-*ii*, *supra*, did not rely on the disputed information in reaching its decision on the motion to remand.

### iv. Costs

In their motion to remand, the Plaintiffs request that the Court award the Plaintiffs their costs and fees. Because the motion to remand is due to be denied, the Plaintiffs are not entitled to costs and fees. *See Bauknight v. Monroe County, Fla.*, 446 F.3d 1327, 1329–32 (11th Cir. 2006).

## IV.    CONCLUSION

For the reasons stated and for good cause, it is

ORDERED that:

1.  The Plaintiffs' motion to remand (doc. 23) is hereby DENIED, and no costs or fees are awarded to the Plaintiffs;

2.  The Defendant's motion to transfer venue (doc. 3) is hereby GRANTED, and the case is hereby TRANSFERRED to the United States District Court for the Northern District of Alabama, Southern Division;

3.  The sealed motion (doc. 27) is hereby DENIED as moot; and

4.  The Defendant's motion to strike (doc. 52) is hereby DENIED as moot.

DONE this 5th day of February, 2020.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE